UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___9/2/2025____
```

ELDER TECHNOLOGIES, INC., *doing business as* Sage,

Plaintiff,

-against-

JULIE VISONE and INSPIREN, INC.,

Defendants.

1:25-cv-6165 (MKV)

OPINION & ORDER DENYING
APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

MARY KAY VYSKOCIL, United States District Judge:

Before the Court is the application of Plaintiff Elder Technologies, Inc., doing business as Sage, ("Sage") for a temporary restraining order and a preliminary injunction against Defendants Julie Visone and Inspiren, Inc. [ECF Nos. 1 ("Cmpl."), 6 ("Proposed Order"), 7 ("Mem."), 10 ("Myers Decl."), 11 ("Mehra Decl."), 12 ("Daugherty Decl."), 13 ("Lynch Decl."), 14 ("Connor Decl."), 38 ("Mehra Supp. Decl."), 39]. Sage creates and sells technology for use in senior living facilities. Its flagship product is a "nurse call system." Cmpl. ¶ 21; Mem. at 1. It recently launched a "fall detection" product in June 2025. Cmpl. ¶ 26; Mem. at 2.

Visone was employed by Sage for "less than six months," on its sales team, selling its nurse call system to senior living facilities. Mem. at 2; *see* Cmpl. ¶¶ 27, 43; Mehra Decl. ¶ 4; Connor Decl. ¶ 6. In connection with her employment at Sage, Visone signed a Proprietary Information and Inventions Agreement [ECF No. 10-1 ("PIIA")]. The PIIA contains confidentiality and non-disclosure provisions. *See* PIIA § 1; Lynch Decl. ¶ 7. It also contains restrictions, for one year after Visone's separation from Sage, on her "performance of services that are the same or similar to those [she] performed for [Sage]" and on her solicitation of "Customers or Prospective Customers" of Sage. PIIA §§ 6, 5.

Visone left Sage in April 2025 to become Head of Integrated Therapy Relationships at Inspiren, another technology company in the senior care industry. *See* Mehra Decl. ¶ 4; Cmpl. ¶ 54; Mem. at 2. Inspiren's flagship product is a fall detection device, and it recently launched a nurse call product. *See* Cmpl. ¶¶ 54, 55; Mem. at 2.

Sage contends that Visone and Inspiren have misappropriated Sage trade secrets and Visone has breached the confidentiality, non-compete, and non-solicitation provisions of the PIIA. Sage seeks a temporary restraining order and preliminary injunction requiring Visone to "cease working at Inspiren," among other relief. Proposed Order at 2.

The parties submitted voluminous evidence, and the Court held a hearing. This Opinion and Order sets forth the Court's findings of fact and conclusions of law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure. For the reasons set forth below, the application by Sage for a temporary restraining order and preliminary injunction is DENIED.

## I.    PROCEDURAL HISTORY

### A. Sage Initiated this Action Well After Visone Started Working at Inspiren.

Approximately three months after Visone left Sage for Inspiren, Sage initiated this action, on July 28, 2025, by filing the Complaint and its application for a temporary restraining order and a preliminary injunction. Sage asserts: (1) a claim against Visone and Inspiren for misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832 *et seq.*, Cmpl. ¶¶ 101–116 ("Claim 1"); (2) a claim against Visone and Inspiren for misappropriation of trade secrets under New York law, Cmpl. ¶¶ 117–124 ("Claim 2"); (3) a claim against Visone for breach of the non-competition provision of the PIIA, Cmpl. ¶¶ 125–133 ("Claim 3"); (4) a claim against Visone for breach of the non-solicitation provision of the PIIA, Cmpl. ¶¶ 134–143 ("Claim 4"); (5) a claim against Visone and Inspiren for unfair competition, Cmpl. ¶¶

2

144–152 ("Claim 5"); (6) a claim against Visone and Inspiren for unjust enrichment, Cmpl. ¶¶ 153–160 ("Claim 6"); and (7) a claim against Inspiren for tortious interference with the PIIA, Cmpl. ¶¶ 161–165 ("Claim 7").

Sage seeks an order preliminarily enjoining Visone and Inspiren from "using, disclosing, copying, duplicating, or otherwise employing Sage's trade secrets," including "pitches, client contacts, price information, [and] operations details" [ECF No. 6 ("Proposed Order")].  The Proposed Order further requires Visone to "cease working at Inspiren" for the remainder of the one-year period since her separation from Sage.  Proposed Order at 2.  It also enjoins Visone from "soliciting or attempting to solicit [Sage's clients or prospective clients] for herself or for others for any business purpose" for the same period of time.  Proposed Order at 3.

### B.  Sage Sought Emergency Relief Citing Specific Alleged Incidents.

In support of its application for a temporary restraining order and a preliminary injunction, Sage initially filed a memorandum of law, a declaration of counsel attaching the PIIA and other exhibits, and declarations from the Chief Executive Officer of Sage, Udit Raj Mehra, and several other Sage executives, including the Head of Sales, Shane Connor [ECF Nos. 7 ("Mem."), 10 ("Myers Decl."), 10-1 ("PIIA"), 11 ("Mehra Decl."), 12 ("Daugherty Decl."), 13 ("Lynch Decl."), 14 ("Connor Decl.")].

In this initial set of filings, Sage argued that Visone had disclosed trade secrets to Inspiren and breached the PIIA based on a specific set of alleged incidents.  In particular, Sage offered evidence that, in late March 2025, Visone attended the "Senior Living 100 Conference" on behalf of Sage and, while there, spoke with the founder of Inspiren, Michael Wang, and another Inspiren executive.  Mehra Decl. ¶ 7; *see* Daugherty Decl. ¶ 8; Mem. at 5, 17.  Sage further asserted that it lost an "opportunity" with a certain prospective client in Florida because, after the Senior Living

3

100 Conference, Visone "stopped putting in effort" on behalf of Sage "and because [Visone allegedly] shared Sage's trade secrets and confidential information with Inspiren during and after the Senior Living 100 Conference."  Mehra ¶ 8; *see* Mem. at 5, 17.

In addition, in its initial set of filings, Sage repeatedly asserted that Visone disclosed Sage's purportedly proprietary pricing information to Inspiren, which allegedly used that information to "undercut Sage's pricing" with certain prospective clients.  Connor ¶¶ 15, 16; *see* Mem. at 1, 3, 5–6, 16, 17, 18.  Specifically, Connor, the Head of Sales, submitted testimony that, since Visone left, he "became aware through the market" that Inspiren made "competing offers" to senior living facilities that "undercut" Sage on price.  Connor ¶¶ 15, 16.  Connor further attested that he was "not aware of this happening before [Visone] left." Connor ¶ 16.

Sage also contended that it was in a "pilot bakeoff" with Inspiren for an opportunity with a "major nationwide chain in Texas."  Mehra ¶ 9; *see* Mem. at 6, 13.  Sage further relied on an incident in which, mere hours after Sage announced the launch of its fall detection product in June 2025, "Inspiren released a video . . . accusing Sage of copying Inspiren'[s] product."  Connor ¶ 18; *see* Mem. at 17.  Sage maintained that "[n]o one outside of Sage personnel knew" of its plan to launch the fall detection product at that time, and therefore, Sage contended, Visone must have disclosed its confidential information to enable Inspiren to respond to the announcement so quickly.  Connor ¶ 18; Mem. at 17.

**C.  The Court Set an Expedited Schedule, and Sage Joined a Request for Delay.**

The day Sage filed its application for emergency relief, the Court issued an Order setting a short deadline for an opposition and scheduled a hearing to take place the next week [ECF No. 17 ("July 28 Order")].  The Court also set a deadline for the parties to "inform[] the Court whether they intend[ed] to call witnesses or offer other evidence at the hearing."  July 28 Order.  The Court

warned the parties that the hearing would be their last opportunity to be heard before the Court ruled on Plaintiff's application for emergency relief.  *See id.*  (In other words, the Court would not hold separate hearings or issue separate rulings on the requests for a temporary restraining order and a preliminary injunction.)

The parties jointly requested an extension of the entire schedule the Court had set in the July 28 Order [ECF No. 21].  The Court granted that joint request [ECF No. 22].

### D.  Defendants Came Forward with Specific Evidence To Rebut Accusations by Sage.

Thereafter, Visone and Inspiren filed an opposition supported by a number of declarations and exhibits [ECF Nos. 23 ("Opp."), 24 ("Visone Decl."), 25 ("Hamilton Decl."), 26 ("Wang Decl."), 27 ("Morris Decl."), 28 ("Tussing Decl."), 29 ("Hollister Decl.")].  Defendants came forward with evidence in response to the specific accusations Sage made of wrongdoing by Visone and Inspiren.

In particular, both Visone and Wang submitted sworn testimony that, although they spoke at the Senior Living 100 Conference, Visone did not, at that time or thereafter, "share[] any of Sage's confidential or trade secret information."  Visone Decl. ¶ 52; *see id.* ¶ 4; Wang Decl. ¶ 18.  Visone further attests that she "never assisted or put any efforts toward helping Inspiren until [she] joined them as an employee" in May 2025.  Visone Decl. ¶ 52.

With respect to the accusation that Visone disclosed Sage's purportedly proprietary pricing information to Inspiren, which then "undercut Sage's pricing," Connor ¶¶ 15, 16, Defendants submitted evidence that "Sage's pricing is widely known in the industry, as is the pricing for Inspiren and their other primary competitor, SafelyYou," Morris Decl. ¶ 23.  Defendants submitted sworn testimony that "[o]ften customers say to [Inspiren] 'Sage/SafelyYou/other competitor is charging us x, what can you do?' or words to that effect."  Morris Decl. ¶ 23.  Moreover, Defendants

explained, Inspiren began making competitive pricing offers when it recently "launched a nurse call product, which competes with Sage's nurse call product," and which has "nothing to do with Ms. Visone." Morris Decl. ¶¶ 18, 19.

Moreover, Defendants submitted sworn declarations from several of Sage's purported prospective clients refuting Sage's accusations. For example, the head of the "major nationwide chain in Texas" expressly denied that Sage and Inspiren are in a "pilot bakeoff" for his business. Hollister Decl. ¶¶ 3, 4. The president of another supposed prospective client attested that Sage's allegations "are simply unfounded." Tussing Decl. ¶ 1.

As for the video, Wang, the founder of Inspiren, attested that he long ago "learned of Sage's fall detection product from Sage's own prospects, clients, and investors—not Julie Visone." Wang Decl. ¶ 6. Indeed, "as early as August 2024," approximately ten months before the June 2025 release, "rumors swirled widely in the industry that Sage was launching a fall detection product." *Id.* ¶ 8. Defendants submitted an article that a Sage investor had posted on its website in December 2024 mentioning that Sage had plans for addressing fall detection [ECF No. 26-1 at 2]. Defendants also submitted a screenshot of February 2025 messages in which Wang states that he learned from a senior living facility that "[i]t is confirmed" that Sage intends to roll out its own "[f]all detection" product [ECF No. 26-6]. Wang submitted sworn testimony that he had shot the video in January 2025 and waited to release it until Sage launched its product. *See* Wang Decl. ¶¶ 11, 16. He also submitted several corroborating documents [ECF Nos. 26-2, 26-3, 26-5].

Defendants also responded more broadly to the claims that Visone has breached the PIIA. With respect to the non-compete, Visone submitted sworn testimony that her duties at Inspiren are not similar to those she performed for Sage. *See* Visone Decl. ¶¶ 1–2, 5, 15–16, 25, 32–33, 36. She explained that, prior to her brief tenure on the sales team at Sage, she had spent more than ten

years in the senior care industry working for "FOX Rehabilitation ('FOX'), a provider of physical, occupational, and speech therapy services." Visone Decl. ¶ 8. During that time, Visone developed relationships with numerous senior living facilities whom she persuaded to "choose FOX as their preferred therapy provider for their residents." Visone Decl. ¶ 9. Visone submitted testimony that her role at Inspiren was a "return to work in therapy." Visone Decl. ¶ 1; *see id.* ¶ 22. According to Visone, as "Head of Integrated Therapy Relationships" for Inspiren, her "job is to work with therapy providers to create strategic partnerships with Inspiren with the goal of using Inspiren's technology to identify therapy needs for seniors and treat them." Visone Decl. ¶ 5.

According to Visone, "[i]n short, at Sage, [Visone] sold its nurse call system to senior living facilities." Visone Decl. ¶ 5. However, at Inspiren, she "do[es] not sell anything to senior living facilities" and "is not [in] a sales role" at all. Visone Decl. ¶ 5. At Inspiren, Visone "work[s] with therapy providers." Visone Decl. ¶ 5. Visone further attested that "Sage is not in the business of integrating with therapy partners." Visone Decl. ¶¶ 2, 5. Indeed, she submitted sworn testimony that she had suggested that Sage start reaching out to therapy companies but "Mehra [the CEO] told [her], 'you clearly don't understand the vision of Sage, we aren't working with therapy companies' (or words to that effect)." Visone Decl. ¶ 2; *accord id.* ¶ 25. Visone further attested that, during her employment at Sage, she "regularly worked with a grand total of seven senior living facilit[ies]" and had "a pre-existing relationship" with each. Visone Decl. ¶ 16.

Similarly, with respect to the non-solicitation provision of the PIIA, Visone testified that "the companies I focused on at Sage are not the same companies I am focused on at Inspiren." Visone Decl. ¶ 45.

**E. The Parties Agreed To Submit All Evidence in Advance of the Hearing, and Both Sides Declined To Cross-Examine the Other Side's Declarants.**

After both sides had filed the initial round of submissions described above (*i.e.*, Plaintiff's

application for emergency relief and Defendants' opposition, together with their evidence), the parties submitted a joint proposal for the proceedings going forward [ECF No. 33 ("Joint Proposal")]. The parties agreed that neither side would call witnesses or present other evidence at the hearing. *See* Joint Proposal ¶ 1. Rather, the parties proposed, Sage would file one additional set of "declarations and/or exhibits," and then Defendants would file one additional set of "declarations and/or exhibits to rebut any evidence that Sage file[d]" in advance of the hearing. Joint Proposal ¶¶ 2, 3. The parties would only "present oral argument from counsel at the Hearing." Joint Proposal ¶ 1.

The Court initially rejected the parties' proposal to submit evidence on a rolling basis "until 'midnight' on the Friday before a Monday morning hearing" [ECF No. 34 ("August 12 Order")]. Instead, in light of the parties' representation that neither side wished to call live witnesses (meaning both sides had declined to cross-examine each other's declarants) or present other evidence at the hearing, the Court set a final deadline for the parties to "submit any additional evidence and notify the Court of any objections to evidence submitted by the other side." August 12 Order. However, Defendants requested reconsideration of the Court's August 12 Order [ECF No. 35]. Defendants represented that "Sage [had] advised Defendants' counsel that [Sage] had 'uncovered additional evidence'" against Visone, which Sage had not shared with Defendants, and which Defendants would have no opportunity to rebut under the Court's August 12 Order [ECF No. 35 at 2]. The Court granted the request for reconsideration, over Plaintiff's opposition, and "endorse[d] the parties' earlier joint proposal" [ECF No. 36]. The Court stressed that the parties would "not be permitted to submit additional evidence" after their respective filing deadlines "absent leave of Court upon a showing of good cause" [ECF No. 36].

**F. Sage Filed a Supplemental Declaration from its CEO, Mehra, which Sage Later Admitted Contained False or Unsubstantiated Accusation of Misconduct by Visone.**

Thereafter, Sage filed a supplemental sworn declaration from Mehra, its CEO, and additional exhibits [38 ("Mehra Supp. Decl."), 39].  In Mehra's Supplemental Declaration, he testified that Visone remotely "***wiped the contents of her work laptop***" after she was on notice of this lawsuit.  Mehra Supp. Decl. ¶¶ 2 (emphasis in original); *accord id.* ¶ 12.  Specifically, Mehra testified that he had "personal knowledge" that Visone remotely wiped her Sage-issued laptop, after she had returned the laptop to Sage, "via her iCloud and FindMy application," while she was "under an obligation to preserve documents and data."  Mehra Supp. Decl. ¶¶ 1, 12.

Furthermore, in Mehra's Supplemental Declaration, he testified that Sage had "forensically review[ed]" Visone's "activities on the shared Google Drive and analyze[d] her Sage email."  Mehra Supp. Decl. ¶ 13.  Mehra purported to testify to the results of that forensic examination and analysis.  *See* Mehra Supp. Decl. ¶¶ 14–21.  In particular, Mehra asserted that Visone's "Google Drive activity skyrocketed" after she spoke with Inspiren executives at the Senior Living 100 Conference.  Mehra Supp. Decl. ¶ 14.  Mehra further asserted that, "leading up to her departure," Visone accessed various Sage documents she had "no business purpose for accessing."  Mehra Supp. Decl. ¶ 15(a); *see id.* ¶¶ 15(a)–(i).

In particular, Mehra accused Visone of downloading and emailing herself "lists of over 30 senior living" providers.  Mehra Supp. Decl. ¶¶ 2, 15(c).  Mehra further asserted, for example, that Visone had accessed a "quote for a deal that [Visone] was not working on."  Mehra Supp. Decl. ¶ 15(f).  In addition, "four days before she gave her notice to Sage," Visone sent an email "following up with [a] client three weeks after her initial request" for information about the facility.  Mehra Supp. Decl. ¶ 19.  Mehra further testified that Visone's activity after she gave her notice was "suspicious" because Connor, the Head of Sales, had "asked her to only 'recap th[e] state of things'

and then 'sit tight.'" Mehra Supp. Decl. ¶¶ 15, 16. According to Mehra, her Google Drive and email activity demonstrates that Visone was preparing to misappropriate Sage trade secrets and disclose its confidential information to Inspiren. *See* Mehra Supp. Decl. ¶¶ 2, 14–16.

In addition, in Mehra's Supplemental Declaration, Mehra argued that Visone breached the non-solicitation provision of the PIIA when she co-hosted a happy hour with a physical therapy provider called EmpowerMe on behalf of Inspiren in late May 2025. *See* Mehra Supp. Decl. ¶¶ 2, 7–10. Mehra testified that Visone had previously solicited business from EmpowerMe on behalf of Sage. *See* Mehra Supp. Decl. ¶¶ 7, 8. He accused Visone of giving "false testimony" that Mehra had told Visone she did not "understand the vision of Sage" which was not "working with therapy companies." Mehra Supp. Decl. ¶ 8. Mehra further contended that Visone's alleged prior meeting with EmpowerMe on behalf of Sage and later happy hour with EmpowerMe on behalf of Inspiren "proves that there is no difference between [her] sales role at Sage and her supposed therapy role at Inspiren." Mehra Supp. Decl. ¶ 10.

### G. Defendants Filed Additional Evidence Rebutting the New Accusations by Sage.

Defendants submitted additional evidence to rebut Mehra's new accusations, along with objections to Mehra's Supplemental Declaration [ECF Nos. 40 ("Visone Supp. Decl."), 41 ("Morris Supp. Decl."), 42 ("Hughes Decl."), 43 ("Objections")]. With respect to Mehra's accusation that Visone had remotely wiped her Sage-issued laptop, Defendants objected that Sage had failed to lay a foundation, since Mehra did not explain how he had "personal knowledge" that Visone allegedly used the Apple "FindMy application" to wipe the laptop. Objections ¶ 1. Visone also submitted sworn testimony that she "ha[s] no idea what Mr. Mehra is talking about," has "never attempted to delete any materials from [her] Sage laptop," and has "no idea how to remotely wipe the contents" of a computer. Visone Supp. Decl. ¶ 13.

Turning to Mehra's testimony about Visone's Google Drive activity, Defendants objected that Mehra should not be permitted to offer lay opinion about a purported forensic examination. *See* Objections ¶ 7.  Visone also responded in detail to Mehra's accusations about her allegedly suspicious activities, explaining her business reasons for accessing documents and sending emails while she was still working at Sage and attesting that she was "giving the company [her] best efforts" before departing. Visone Supp. Decl. ¶ 30; *see id.* ¶¶ 15–16, 20, 21, 23, 26, 27, 29, 30. Specifically, with respect to her "skyrocket[ing]" Google Drive activity, Visone testified that she "had significant follow-up to do on behalf of Sage following the Senior Living Conference, . . . all of which [she had] documented on [a] post-conference sheet within Sage." Visone Supp. Decl. ¶¶ 15, 16.  As for the lists of senior living providers, Visone testified that she "often email[s] [herself] . . . as a way to remind herself to do certain things," and, in any event, the information she sent is "not proprietary to Sage," since it is "provided to Sage" by a third party, and the same or similar information is publicly available.  Visone Supp. Decl. ¶¶ 32, 33; *see also* Morris Decl. ¶ 35; Visone Decl. ¶ 47;  Visone Decl., Ex. I (publicly-available list of "the top 150 senior living providers"). She explained that she could have accessed a document about a deal she did not work on as "a template for another client." Visone Supp. Decl. ¶ 27.  Visone also testified that, after she gave notice of her resignation, Connor had "asked [her] to 'download him on everything [she] had going on' (or words to that effect)," which required her to access documents and send emails.  Visone Supp. Decl. ¶ 20; *see id.* ¶¶ 23, 26.

With respect to the accusation that Visone's interactions with EmpowerMe breached the PIIA, Visone again testified that Sage does not work with therapy companies such as EmpowerMe. *See* Visone Supp. Decl. ¶¶ 2–10.  She testified that "EmpowerMe was not a customer of Sage during [her] employment."  Visone Supp. Decl. ¶ 9.  Visone explained that, while she was at Sage,

she briefly interacted with an EmpowerMe executive, Nick Hughes, when she "ran into [him] . . . by chance," but she "did not follow up" because "Sage was not working with therapy companies." Visone Supp. Decl. ¶¶ 5, 6.  Defendants also submitted a sworn declaration from EmpowerMe's Hughes attesting that "EmpowerMe is not a customer or prospective customer of Sage," and "Sage has not pitched its business to EmpowerMe."  Hughes Decl. ¶ 3.

### H. The Parties Filed Letters Following the Second Round of Submissions, Including an Admission by Sage that Mehra had Submitted False or Unsubstantiated Testimony.

After both sides had filed their second round of evidentiary submissions on their respective deadlines, Sage filed a letter request to strike Defendants' Objections to the Mehra Supplemental Declaration, arguing that the Court's ultimate endorsement of the parties' Joint Proposal for the proceedings did not expressly allow objections [ECF No. 46].  Defendants opposed the request to strike and sought leave to file a declaration from a computer forensics expert in response to Mehra's testimony about Visone's alleged digital misdeeds [ECF No. 47].

Sage then filed a letter admitting that it had "learned that the laptop referenced in [Mehra's Supplemental Declaration] may not have been the laptop that Ms. Visone used in the course of her employment" [ECF No. 50 ("Sage Admission")].  Sage stated that it was, therefore, "submitting a Revised" version of Mehra's Supplemental Declaration, "which removes references to the laptop." Sage Admission.  Sage further requested that the Court "stay any decision" on Defendants' request to submit testimony from a computer forensics expert.  *Id.*

The Court issued an Order dated August 20, 2025 [ECF No. 53 ("August 20 Order")].  The Court denied Plaintiff's request to strike Defendants' Objections.  August 20 Order at 1.  The Court explained that "[w]hile the Court is not strictly bound by the Federal Rules of Evidence in deciding whether to award preliminary injunctive relief, a party is still entitled to raise objections . . . , as the Court noted in an earlier Order."  August 20 Order at 1 (citing *Mullins v. City of New York*, 626

F.3d 47, 51–52 (2d Cir. 2010)).  The Court denied Defendants' request to submit testimony from a computer forensics expert, observing that Sage had already admitted that pertinent "testimony in Mehra's Supplemental Declaration . . . was false or, at minimum, may have been unfounded."  *Id.* The Court also rejected "Plaintiff's improper attempt to file, after its deadline to submit evidence, a revised version of Mehra's Supplemental Declaration that 'remove[d]' his false or unfounded accusation that Visone [had] remotely wiped [her] laptop."  *Id.* at 1–2.

The Court held a hearing on August 21, 2025 ("Tr.").  Because both sides had agreed to submit all evidence in advance of the hearing and had declined the opportunity to cross-examine the other sides' declarants, the Court heard only oral argument from counsel about the evidence summarized above.

At the hearing, Plaintiff's counsel conceded that Sage is seeking a mandatory injunction and, as such, must meet an "even higher" burden to obtain relief.  Tr. at 9:5–12.

In light of that concession, the Court pressed Plaintiff's counsel on how Sage can show a likelihood of success on the merits on any of its claims given that Visone, among other declarants for the defense, denied Plaintiff's accusations of wrongdoing, under oath and in detail, and Sage declined to cross-examine Visone, or any other declarant, on those denials.  *See, e.g.*, Tr. at 10:25–11:2, 14:15–19.  For example, the Court pointed out, "Ms. Visone put in a sworn declaration in which she declared under penalty of perjury that her role [at Inspiren] is not a sales role," and that she works with therapy providers rather than senior living facilities, and Sage "declined to cross-examine her."  Tr. at 14:15–19; *see id.* at 10:25–11:2 ("[Y]ou are asking me to make credibility determinations in your favor in a motion on which you have the burden of proof.")[1]

_____

[1] At the hearing, Plaintiff's counsel stated: "I understand your Honor can't make credibility determinations."  Tr. at 15:20.  That understanding is incorrect.  *See* 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2949 (3d ed., updated May 21, 2025) (explaining that, on a motion for a preliminary injunction, a trial court has "discretion" to evaluate "the quality of [an] affidavit" and decide "how much weight" and "credence" to give the

Plaintiff's counsel responded that he is "not asking [the Court] to disbelieve the facts that Ms. Visone is presenting." Tr. at 11:3–4. Rather, Sage contends that "the only conclusion to be drawn from the things she's said she is doing is that she's serving the same function." Tr. at 11:6–8. Plaintiff's counsel argued that, even if Visone now works with therapy providers, her "role is to serve as a part of a team that is attempting" ultimately to get Inspiren products into "elder care facilities." Tr. at 12:11–20. The Court pressed back at Sage's broad-brush characterization of Visone's role at Inspiren by pointing out that, "at the end [of] the day, that is the goal of every single person who works for the company." Tr. at 12:21–22. Counsel for Sage, however, failed to offer any specific evidence that Visone actually functioned in a sales role at Inspiren, as she had at Sage, or any convincing argument to distinguish Visone's asserted ultimate goal from the ultimate goal of any other Inspiren employee, including the "people who develop the technology . . . . with the ultimate goal of getting it into senior care facilities." Tr. at 12:23–13:4

When pressed on the "evidence" for the misappropriation of trade secrets claims, at the hearing, Plaintiff's counsel relied entirely on the testimony in Mehra's Supplemental Declaration about "Visone's Google Drive activity" before she left Sage. Tr. at 17:9–25.

Plaintiff's counsel also conceded on the record at the hearing that Sage is not entitled to an order prohibiting Visone from working at Inspiren altogether, which is among the principal relief

---

testimony); *Mullins v. City of New York*, 634 F. Supp. 2d 373, 390 n.115 (S.D.N.Y. 2009) ("declin[ing] to fully credit" an affidavit in connection with a motion for a preliminary injunction), *aff'd*, 626 F.3d 47 (2d Cir. 2010). To be sure, the Second Circuit has held that "[n]ormally, an evidentiary hearing is required to decide credibility issues." *Forts v. Ward*, 566 F.2d 849, 851 (2d Cir. 1977). However, the Second Circuit has also held that, in the context of a preliminary injunction a party "who joins '[a] battle of affidavits' . . . should not be heard to complain when the decision is adverse." *Dopp v. Franklin Nat. Bank*, 461 F.2d 873, 879 (2d Cir. 1972); *see also Sugarhill Recs. Ltd. v. Motown Rec. Corp.*, 570 F. Supp. 1217, 1222 (S.D.N.Y. 1983) ("the parties were presented with an opportunity to present oral testimony but chose instead to rely on their submitted affidavits"). Indeed, the Court stated on the record at the hearing that Mehra's "credibility" is compromised because he "put in an affidavit that made accusations he had to retract." Tr. at 5:2–3.

Sage requests in its Proposed Order, since the PIIA prohibits her only from performing "the same or similar services." Tr. at 24:18–24.

## II.    FINDINGS OF FACT

The Court makes the following Findings of Fact, pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure, based on the record before the Court at this stage of the case. *See Cayuga Indian Nation of New York v. Seneca County, New York*, 978 F.3d 829, 834 (2d Cir. 2020) (explaining that "findings of fact" from "a preliminary injunction proceeding" do not remain binding at later stages of the case). As noted above, counsel for Sage represented to the Court on the record that Plaintiff is "not asking [the Court] to disbelieve" any of "the facts" to which Visone has attested in her sworn declarations. Tr. at 11:3–4

### A. Background on the Parties

Sage was founded in 2021 by Udit Raj Mehra and others. Mehra Decl. ¶ 3. Its "flagship" product was its "nurse call" system. Morris Decl. ¶ 7; *see* Cmpl. ¶ 21; Mem. at 1. In June 2025, Sage announced it was launching a fall detection product. Connor ¶ 18; Morris ¶ 9. Prior to the launch, Sage raised "$35 million [in] Series B" funding [ECF No. 10-2 at 1 ("Pl. Ex. 5") (in a public December 2024 "Letter from Our CEO" on the Sage website about its Series B fundraising, Mehra explains that "the greatest risk [to his grandmother] was a fall")].

Inspiren was founded in 2016 by Michael Wang. *See* Wang Decl. ¶ 1. Its "flagship" product was its "fall detection" technology. Morris Decl. ¶ 6; Wang Decl. ¶ 2. In March 2025, Inspiren "announced that it was launching a nurse call product, which competes with Sage's nurse call product." Morris Decl. ¶ 8.

Julie Visone has worked in the senior care industry for well over a decade. Visone Decl. ¶ 7. For much of her career, she worked for FOX, a company that provides therapy services. Visone

Decl. ¶ 8.  During that time, Visone developed relationships with "many" senior living facilities. Visone Decl. ¶ 9; *see id.* ¶ 17.

### B.  Visone's Employment at Sage and the PIIA

Visone joined the Sage "Sales Team" in November 2024.  Mehra Decl. ¶ 4; *see* Visone Decl. ¶ 11.  She was hired in part because of her "pre-existing relationships" with senior living facilities.  Visone Decl. ¶ 13; *see* Visone Decl., Ex. B; *see also* Daugherty Decl. ¶ 4 (Daugherty, the "Head of Community" at Sage, testifying that she met Visone when Visone worked at FOX and Daugherty worked at a senior living facility).

As a condition of her employment by Sage, Visone signed a Proprietary Information and Inventions Agreement [ECF No. 10-1 ("PIIA")].  The PIIA prohibits Visone from disclosing any "Proprietary Information . . . during [her] service to the Company and thereafter."  PIIA § 1.1. Proprietary Information is defined to include "trade secrets," "plans for . . . new products," "prices and costs," "marketing information," "information regarding customers and potential customers," and other information."  PIIA § 1.2.  However, the PIIA expressly provides that "[n]otwithstanding the forgoing" definitions, "'Proprietary Information' does not include," *inter alia*, "information that is or becomes generally known . . . through no fault of [Visone's]," or "information that was part of [Visone's] general knowledge prior to" joining Sage.  PIIA § 1.2.

The PIIA provides that, for a period of one year after Visone's separation from Sage, Visone may not engage in the "performance of services that are the same or similar to those [she] performed for [Sage]."  PIIA § 6.  This non-compete provision of the PIIA also contains a geographic limitation, although the "Restricted Territory" is defined very broadly.  *See* PIIA § 6. The PIIA also prohibits Visone from "directly or indirectly" soliciting "Customers or Prospective Customers" of Sage during the one-year period.  PIIA § 5.

While employed by Sage, Visone was responsible, together with a few other employees, for "sales of Sage's nurse call system to senior living facilities." Visone Decl. ¶ 15 *see id.* ¶¶ 5, 45; Daugherty Decl. ¶ 5; Connor Decl. ¶ 6. She worked on a commission basis. *See* Connor Decl. ¶ 14; *see also* Visone Decl. ¶¶ 11, 60. During Visone's employment, Shane Connor was promoted to Head of Sales, and Visone felt that she "was not provided with opportunities for career advancement." Visone Decl. ¶¶ 19, 20; *see* Connor Decl. ¶ 7.

During her brief tenure at Sage, Visone "regularly worked with a grand total of seven senior living facility customers, each of whom [she] had a pre-existing relationship with before joining Sage." Visone Decl. ¶ 16. Visone understood that Sage did not work with companies that provide therapy services. *See* Visone Decl. ¶¶ 2, 25.

While employed by Sage, Visone attended a conference where, "by chance, [she] ran into Nick Hughes," an executive at "EmpowerMe," a therapy company. Visone Supp. Decl. ¶ 5. She had known Hughes "for several years." Visone Supp. Decl. ¶ 5. The two spoke "casually" about Hughes having "a connection with a senior living facility" and "set[ting] up a meeting" between Visone and the facility. Visone Supp. Decl. ¶ 5. However, neither Hughes nor Visone "follow[ed] up." Visone Supp. Decl. ¶ 6.

In late March 2025, Visone attended the Senior Living 100 Conference on behalf of Sage. *See* Connor Decl. ¶ 13. Sage considers such "industry-wide conferences . . . very important because they give Sage an opportunity to network with potential clients and vendors, pitch Sage's product, and meet other players in the industry." Connor Decl. ¶ 11.

Visone had "conversations" with Wang and another Inspiren executive at the Senior Living 100 Conference. Daugherty Decl. ¶ 8; *see* Connor Decl. ¶ 13. She did not, however, "share[] any

of Sage's confidential or trade secret information" during those conversations.  Visone Decl. ¶ 52; *see id.* ¶ 4; Wang Decl. ¶ 18.

On April 28, 2025, fewer than six months after she began her employment at Sage, Visone "provided Sage notice of [her] intent to resign and join Inspiren as its Head of Integrated Therapy Relationships."  Visone Decl. ¶ 1; *accord id.* ¶ 22; Connor Decl. ¶ 14.  Sage, however, "informed" Visone that she could not work for "Inspiren or any other alleged competitor for 12 months."  Visone Decl. ¶ 24; *see id.* ¶ 27 (Visone testifying that Mehra took the position that the "PIIA bars [Visone] from working for any competitor in any capacity whatsoever for one year").

After Visone gave notice of her resignation, Connor instructed her to "recap" or "download him on" her work.  Mehra Supp. Decl. ¶ 16; Visone Supp. Decl. ¶ 20.

### C.  Visone's Employment at Inspiren

Visone began working at Inspiren on May 12, 2025.  Visone Decl. ¶ 32; Morris Decl. ¶ 13.  At Inspiren, Visone works with "therapy providers."  Visone Decl. ¶ 33; Morris Decl. ¶ 15.  She has "discussions" with therapy companies about "the goal of using Inspiren's technology to identify therapy needs for seniors and treat them" and "potentially working together to share data."  Visone Decl. ¶ 33; *see* Morris Decl. ¶ 15.

Unlike her role at Sage, "Visone's role at Inspiren is not a sales role."  Morris Decl. ¶ 15; *see* Visone Decl. ¶ 32.  She is "not compensated on a commission basis."  Visone Decl. ¶ 32.  She "does not sell nurse call systems to senior living facilities."  Morris Decl. ¶ 15.  She "does not sell anything to senior living facilities."  Morris Decl. ¶ 15.

### D.  Inspiren's Competitive Pricing and Video

As noted above, Inspiren launched a nurse call product in March 2025, "which competes with Sage's nurse call product."  Morris Decl. ¶ 19.  "Prior to March [of] 2025, Inspiren did not

have a nurse call product and thus, was not competing with Sage" on the price of "Sage's primary product." Morris Decl. ¶ 19. Visone, who joined Inspiren in May 2025, "was not involved in the development of Inspiren's nurse call product," has "had nothing to do with [its] pricing," and "has no role at all in determining pricing at Inspiren." Morris Decl. ¶¶ 19, 22.

Moreover, although Sage asserts that its "pricing model is proprietary and confidential," the Court finds that Inspiren learns of Sage prices through third parties "in the industry." Connor Decl. ¶ 16; Morris Decl. ¶ 23. Inspiren has offered unrebutted evidence that "Sage's pricing is widely known in the industry, as is the pricing for Inspiren and their other primary competitor, SafelyYou." Morris Decl. ¶ 23; *see* Hollister Decl. ¶ 11 (the CEO of a senior living provider testifying that Sage "pricing, like pricing provided by Sage's competitors, is fairly well known in the industry and is not a secret"). For example, Inspiren has offered unchallenged testimony that "customers [often] say to [Inspiren], 'Sage/SafelyYou/other competitor is charging us x, what can you do?' or words to that effect." Morris Decl. ¶ 23. Indeed, Sage itself offers testimony that it has learned "*through the market* that Inspiren is making competing offers and attempting to undercut [Sage] on price." Connor Decl. ¶ 16 (emphasis added). Thus, Sage's own evidence undermines its assertion that pricing is confidential and supports Inspiren's testimony that industry participants share information about pricing.

The Court also finds that "Inspiren learned of Sage's fall detection product from Sage's own prospects, clients, and investors—not Julie Visone." Wang Decl. ¶ 6. Sage asks the Court to infer that Visone must have disclosed its confidential information because Inspiren released a video mere "hours" after Sage announced the launch of its fall detection product in June 2025. Connor Decl. ¶ 18. Wang, however, offers extensive evidence that he shot the video in January 2025 and waited until Sage announced to release it. *See* Wang Decl. ¶¶ 11, 16; Wang Decl., Ex. B; *id.*, Ex.

C; *id.*, Ex. D; *id.*, Ex. E.  Wang "suspected that Sage was planning to bring a fall detection product to market at early as August 2024," before Visone even joined Sage.  Wang Decl. ¶ 7; *see also* Wang Decl., Ex. A.  Indeed, based on evidence that Sage put in the record, Sage suggested in a public document in December 2024 that it was raising Series B funding in contemplation of making a fall detection product.  *See* Pl. Ex. 5.  Wang received confirmation that Sage was "rolling out" its fall detection product from a senior living facility "over a month before [he] met Julie Visone."  Wang Decl. ¶ 12; *see id.* ¶¶ 13, 15; Wang Decl., Ex. G.

## III.    CONCLUSIONS OF LAW

"It is well established that in this Circuit the standard for [a temporary restraining order] is the same as for a preliminary injunction."  *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (collecting cases).  A preliminary injunction may be either prohibitory or mandatory.  *N. American Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it."  *Id.*  To obtain a preliminary injunction, a plaintiff must show (1) irreparable harm; (2) "a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party"; and (3) that a preliminary injunction is in the public interest.  *Id.* at 37.  "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'"  *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)).

As Plaintiff's counsel conceded on the record, Sage seeks a mandatory injunction and must therefore meet the heightened standard of showing a clear likelihood of success on the merits to obtain preliminary relief.  *See* Tr. at 9:5–12; *N. American Soccer League, LLC*, 883 F.3d at 37.  As

explained below, Sage fails to show a clear likelihood of success on the merits of any of its claims. As such, Sage is not entitled to preliminary relief. *See N. American Soccer League, LLC*, 883 F.3d at 37; *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005) (explaining that preliminary relief is an "extraordinary and drastic remedy" that must not issue unless the movant carries its burden); *GeigTech E. Bay LLC v. Lutron Elecrtonics Co.*, No. 18-cv-5290 (CM), 2018 WL 4360792, at *2 (S.D.N.Y. Sept. 5, 2018) ("failure to demonstrate any one of the[] [required] elements dooms the quest for a preliminary injunction.").

## A. Irreparable Harm

Before turning to Plaintiff's failure to show a clear likelihood of success on the merits on any of its claims, the Court concludes that Sage failed to make the requisite showing of irreparable harm. The Second Circuit has "described a showing of irreparable harm as the *sine qua non* for preliminary injunctive relief." *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1294–95 (2d Cir. 1995) (citing *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) ("reversing grant of preliminary injunction where district court found only 'possibility' rather than 'likelihood' of irreparable harm")); *see also Naden v. Numerex Corp.*, 593 F. Supp. 2d 675, 680 (S.D.N.Y. 2009) ("[I]f there is no irreparable injury, there can be no preliminary injunction.") (quoting *Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*, 988 F. Supp. 404, 406 (S.D.N.Y. 1997)). To be sure, in some cases, an alleged misappropriation of trade secrets, as well as a loss of client relationships and customer goodwill resulting from the breach of a restrictive covenant, may constitute irreparable harm. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). However, "the burden of proof and persuasion rest[s] squarely" on the party moving for preliminary relief to show that irreparable harm is likely in this case. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60,

68 (2d Cir. 2007); *see Faiveley Transp. Malmo AB*, 559 F.3d at 119–120.

The Court concludes that Sage failed to carry its burden to show irreparable harm based on its delays in seeking relief. Its "failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979)); *see Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("delay may . . . preclude the granting of preliminary injunctive relief"). Sage waited approximately three months after Visone departed for Inspiren to file this case and its application for emergency relief [ECF Nos. 1, 6]. *See* Visone Decl. ¶ 1; Connor Decl. ¶ 14. Three months is more than half the total time Visone was employed by Sage. *See* Visone Decl. ¶ 1 ("I was employed by Sage for fewer than six months"); Mehra Decl. ¶ 4; Connor Decl. ¶ 6. Indeed, Sage is in the position of seeking a mandatory injunction, rather than a prohibitory injunction, because it waited until Visone had been working at Inspiren for more than two months to seek relief. *See* Visone Decl. ¶ 32; Morris Decl. ¶ 13. Moreover, having filed an application for emergency relief, Sage joined a request to delay the schedule on which the Court would rule on its application [ECF No. 21].

Accordingly, the Court concludes that Sage has failed to make the requisite showing of irreparable harm. This conclusion alone requires the Court to deny its application for emergency relief. *See USA Recycling, Inc.*, 66 F.3d at 1294–95.

## B. Likelihood of Success on the Merits

The Court concludes, in addition, that Sage has failed to show the "clear" likelihood of success on the merits required for a mandatory injunction. *N. American Soccer League, LLC*, 883

F.3d at 37. Indeed, on the current record before the Court at this stage of the case, Sage has not

shown any likelihood of success on the merits of any of its claim.

### 1. Sage Failed To Show a Likelihood of Success on its Misappropriation Claims.

Sage has not carried its burden with respect to its misappropriation of trade secrets claims

under the federal Defending Trade Secrets Act and New York common law (Claim 1 and Claim 2,

respectively). *See* Cmpl. ¶¶ 101–116; *id.* ¶¶ 117–124.

To prevail on a claim for misappropriation of trade secrets under the DTSA, a plaintiff

"must show 'an unconsented disclosure or use of a trade secret by one who (i) used improper

means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the

trade secret was acquired through improper means, under circumstances giving rise to a duty to

maintain the secrecy of the trade secret, or derived from or through a person who owed such a

duty.'" *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 462 (S.D.N.Y. 2017) (quoting *Syntel*

*Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 2016 WL 5338550, at *6 (S.D.N.Y. Sept.

23, 2016)). "Under New York law, a party must demonstrate: (1) that it possessed a trade secret,

and (2) that the defendants used that trade secret in breach of an agreement, confidential

relationship or duty, or as a result of discovery by improper means." *Id.* at 461–62 (citing *N. Atl.*

*Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)). In all events, the claim must

involve information that is secret. *See id.*

In its initial set of submissions, Mehra broadly speculated that Visone "shared Sage's trade

secrets and confidential information with Inspiren during and after the Senior Living 100

Conference." Mehra ¶ 8. In response, Defendants offered sworn testimony from Visone, Wang,

and others that Visone "never shared any of Sage's confidential or trade secret information" with

Inspiren at the Senior Living 100 Conference or thereafter.  Visone Decl. ¶ 52; *see id.* ¶ 4; Wang Decl. ¶ 18; Morris ¶ 24; *see also* Tussing ¶ 3.

Moreover, the specific categories of information that Sage contends Visone improperly shared with Inspiren were not, in this case, secrets.  In particular, although Sage asserted that its pricing is "confidential," as explained above in the Court's Findings of Fact, unrebutted evidence in the record, including the testimony of a Sage declarant, shows that Sage prices were not kept confidential.  *See* Morris Decl. ¶ 23; Connor Decl. ¶ 16; Hollister Decl. ¶ 11.  Furthermore, the unrebutted evidence in the record is that Visone "has no role at all in determining pricing at Inspiren."  Morris Decl. ¶¶ 19, 22.  As such any alleged disclosure by Visone of information about Sage prices cannot sustain a claim for misappropriation of trade secrets under the DTSA or New York law.  *See In re Document Techs. Litig.*, 275 F. Supp. 3d at 461–62.

On the record at the hearing, counsel for Sage represented that the "evidence" on which Sage is relying for its misappropriation claims is, principally or solely, the testimony in Mehra's Supplemental Declaration about "Visone's Google Drive activity" shortly before she left Sage.  Tr. at 17:9–25.  This presumably includes Mehra's accusation in his Supplemental Declaration that Visone downloaded and emailed herself lists of senior living providers.  *See* Mehra Supp. Decl. ¶¶ 2, 15(c).  There are myriad problems with this supposed evidence.

As an initial matter, as explained in the Procedural History section of this Opinion, Sage admitted that Mehra's Supplemental Declaration contained a false or unfounded accusation that Visone had remotely "***wiped the contents of her work laptop***" [ECF No. 50].  Mehra Supp. Decl. ¶¶ 2 (emphasis in original); *accord id.* ¶ 12.  Mehra's sworn testimony making an admittedly false or unfounded accusation undermines the credibility of all Mehra's other accusations.  *See Rui Ying Lin v. Gonzales*, 445 F.3d 127, 133 (2d Cir. 2006) (discussing the maxim "*falsus in uno, falsus in*

24

*omnibus*"); 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2949 (explaining that, on a motion for a preliminary injunction, a trial court has "discretion" to evaluate "the quality of [an] affidavit" and decide "how much weight" and "credence" to give the testimony).

In any event, as Defendants correctly pointed out in their Objections [ECF No. 43], Sage failed to lay any foundation for Mehra's testimony about Visone's purported Google Drive activity. Sage has not offered any explanation of how Mehra, the CEO of the company, attests to having "personal knowledge" of Visone's purported Google Drive activity. Mehra Supp. Decl. ¶ 1. Sage also has not offered a reason why the Court should credit his lay opinion about the result of a purported "forensic analysis" of her Google Drive. Mehra Supp. Decl. ¶ 15. While the Court is not strictly bound by the Federal Rules of Evidence in deciding whether to grant preliminary relief, the Court is not required to give full credence and weight to testimony that is clearly without foundation and is ordinarily inadmissible. *See Mullins*, 626 F.3d 51–52.

Moreover, even if the Court credits Mehra's testimony that Visone emailed herself lists of senior living providers, that evidence does not support a misappropriation of trade secrets claim. The unrebutted evidence in the record is that Sage does not compile such lists itself and the same or similar information is publicly available. *See* Visone Supp. Decl. ¶¶ 32, 33; Visone Decl. ¶ 47; Visone Decl., Ex. I; *see also* Opp. at 14 ("Sage lists many of its customers on its website"). Furthermore, Sage has not offered any evidence of an improper "disclosure" by Visone or "use" by Visone or Inspiren of any of the information Visone allegedly accessed on the Google Drive before she left Sage, even though such a disclosure or use is a required element of a claim for misappropriation of trade secrets. *In re Document Techs. Litig.*, 275 F. Supp. 3d at 462. Rather, Sage asks the Court simply to infer that an improper disclosure or use of its information occurred,

in the face of sworn declarations to the contrary.  *See* Visone ¶ 4; Morris ¶ 16.  Sage, however, has

the burden of proof and persuasion.  *See Moore*, 409 F.3d at 510.

For all of these reasons, Sage has fallen far short of showing the required clear likelihood

of success on the merits of its misappropriation of trade secrets claims.

### 2.  Sage Failed To Show a Likelihood of Success on The Merits of its Claims for Breaches of the PIIA

Sage similarly failed to show a likelihood of success on the merits of its claims that Visone

has breached the non-competition and non-solicitation provisions of the PIIA (Claim 3 and Claim

4, respectively).  *See* Cmpl. ¶¶ 125–133; *id.* ¶¶ 134–143.

### a.  Non-Competition

The non-competition provision of the PIIA restricts only Visone's "performance of services

that are the same or similar to those [she] performed for [Sage]."  PIIA § 6.  Defendants have come

forward with ample evidence that Visone performs a different job for Inspiren than she performed

for Sage.  At Sage, Visone sold nurse call systems to senior living facilities.  *See* Visone Decl. ¶¶

5, 15.  She was on the Sales Team and received commissions.  *See* Mehra ¶ 4; Connor Decl. ¶ 14;

Visone Decl. ¶¶ 11, 60.  She worked with senior living providers and understood that Sage did not

work with therapy providers.  *See* Visone Decl. ¶¶ 2, 5, 25.  By contrast, at Inspiren, Visone does

not sell nurse call systems to senior living facilities or anyone else.  Her "role at Inspiren is not a

sales role," and she is "not compensated on a commission basis."  Morris Decl. ¶ 15; Visone Decl.

¶ 32.  At Inspiren, Visone works with therapy providers, not senior living providers.  *See* Visone

Decl. ¶ 33; Morris Decl. ¶ 15.

In spite of the evidence of key differences between Visone's former role at Sage and current

role at Inspiren, Sage asks the Court to draw an inference that "the only conclusions to be drawn

from the things she's said she is doing is that she's serving the same function."  Tr. at 11:6–8.  In

particular, Sage argues, whatever Visone's specific duties may be, it "is a means to an end to get Inspiren products into senior and elder care facilities." Tr. at 11:10–11.  However, as the Court pointed out at the hearing, every employee of Inspiren contributes to that ultimate goal, including the engineers who make the technology.  *See* Tr. at 12:21–22.  As counsel for Sage conceded on the record, the PIIA does not prohibit Visone from occupying any role, whatsoever, at Inspiren, or otherwise contributing, in any way, to the ultimate goal of placing Inspiren products in senior living facilities.  *See* Tr. at 24:18–24.[2]  The PIIA prohibits Visone only from engaging in the "performance of *services* that are the same or similar to those [she] performed for [Sage]."  PIIA § 6 (emphasis added).  Based on Visone's unrebutted testimony, which Sage expressly is "not asking [the Court] to disbelieve," the Court concludes that the service Visone performs for Inspiren is different from the service she performed for Sage.  Tr. at 11:3–4.

Sage contends that Visone's testimony that, after joining Inspiren, she co-hosted a happy hour with EmpowerMe at a conference "proves that there is no difference between [her] sales role at Sage and her supposed therapy role at Inspiren."  Mehra Supp. Decl. ¶ 10.  However, as both sides agree, EmpowerMe is a "therapy company."  Mehra Supp. Decl. ¶ 7; *see* Visone Decl. ¶ 34. As such, Visone's co-hosting an event with EmpowerMe is consistent with her testimony that, at Inspiren, she works with therapy providers, which is different from her work at Sage selling nurse call systems to senior living facilities.  At the hearing, counsel for Sage argued that "[t]he attendees of those conferences" are senior living facilities and, therefore, "[t]he goal of hosting that happy hour" was to "get the end consumers of Sage's and Inspiren's products to purchase those products." Tr. at 13:21–14:9.  However, Sage has offered no evidence whatsoever of who attended the happy hour, and the Court has already rejected the notion that any Inspiren employee who contributes to

---

[2] At the Hearing, the Court stated: "There's nothing that says she can't work in the company."  Tr. at 24:19–20.  Counsel for Sage responded: "I 100 percent agree . . . ."  Tr. at 24:21.

the ultimate goal of selling Inspiren products performs the same or similar services to those Visone performed for Sage.

On a motion for emergency relief, Sage has the burden. *See Moore*, 409 F.3d at 510. It is not entitled to have inferences, for which it has offered no support, drawn in its favor. Yet Sage "elected not to cross-examine" Visone on her unequivocal testimony that the services she performs for Inspiren are not the same or similar to those she performed for Sage. Tr. at 15:12–16. Sage plainly failed to show a clear likelihood of success on the merits of its claim that Visone has breached the non-competition provision of the PIIA.

### b.  Non-Solicitation

Sage likewise failed to show a likelihood of success on the merits of its claim that Visone has breached the non-solicitation provision of the PIIA. The PIIA prohibits Visone from "directly or indirectly" soliciting "Customers or Prospective Customers" of Sage for one year after Visone's separation from Sage. PIIA § 5. In its initial round of submissions in support of its application for a temporary restraining order and preliminary injunction, Sage relied on specific incidents with identifiable customers or prospective customers in support of its claim for breach. *See supra* at 3–4. In response, Defendants came forward with specific evidence to rebut the accusations by Sage, including declarations from customers or prospective customers that Sage had identified (albeit not by name) in its papers. For example, the head of the "major nationwide chain in Texas" Sage had mentioned expressly denied that Sage and Inspiren are in the alleged "pilot bakeoff" for his business. Hollister Decl. ¶¶ 3, 4. The head of another supposed prospective client attested that Sage's allegations "are simply unfounded." Tussing Decl. ¶ 1.

Similarly, Sage later contended that Visone had breached the non-solicitation provision when she co-hosted a happy hour with EmpowerMe. In particular, Mehra testified that Visone had

28

previously solicited business from EmpowerMe on behalf of Sage. *See* Mehra Supp. Decl. ¶¶ 7, 8. In Visone's Supplemental Declaration, she testified that she merely had a chance encounter with an executive of EmpowerMe when she worked at Sage. *See* Visone Supp. Decl. ¶¶ 5, 6, 9. Moreover, Defendants submitted a sworn declaration from the executive expressly testifying that EmpowerMe "is not a customer or prospective customer of Sage," and Sage has never "pitched its business to EmpowerMe." Hughes Decl. ¶ 3.

Sage has further asserted that it lost an "opportunity" with a certain prospective customer in Florida because, after the Senior Living 100 Conference, Visone "stopped putting in effort" on behalf of Sage and "instead put her efforts towards helping Inspiren." Mehra Decl. ¶ 8. Visone denied this accusation in her sworn declaration. *See* Visone Decl. ¶ 52. Unlike with other supposed prospective clients of Sage, Defendants did not identify and come forward with a declaration from the Florida company. It is Sage, however, that has the burden of proof and persuasion. *See Moore*, 409 F.3d at 510. The uncorroborated and facially speculative accusation of a declarant who has made at least one admittedly false (or unfounded) accusation of wrongdoing by Visone is not sufficient to show a clear likelihood of success on the merits of its claim that Visone has breached the non-solicitation provision of the PIIA, particularly in the face of an unimpeached denial of Mehra's speculative accusation.

### 3. Sage Failed To Show a Likelihood of Success on its Other Claims.

In the Complaint, Sages asserts a claim against Visone and Inspiren for unfair competition (Claim 5), a claim against Visone and Inspiren for unjust enrichment (Claim 6), and a claim against Inspiren for tortious interference with the PIIA (Claim 7). Cmpl. ¶¶ 144–152, 153–160, 161–165. In its memorandum of law in support of its application for a temporary restraining order and preliminary injunction, Sage offers cursory arguments that it will prevail on its unfair competition

and unjust enrichment claims because "Defendants are misappropriating Sage's trade secrets to solicit clients" and "undercut[] Sage on pricing," and "Defendants unjustly enriched themselves at Sage's expense through their use of Sage's trade secrets."  Mem. at 24, 25.  However, as the Court explained at length above, Sage failed to show any misappropriation of any trade secrets.  *See supra* at 23–26.  As such, as its own brief arguments make clear, Sage likewise has not shown a likelihood of success on the merits of unfair competition and unjust enrichment claims.  Similarly, the Court concluded that Sage failed to show any breach of the PIIA, thereby precluding a tortious claim, which, Sage acknowledges, requires "actual breach."  Mem. at 25.

In any event, on the record at the hearing on its application for emergency relief, counsel for Sage expressly represented to the Court that Sage was "resting on" only its claims for misappropriation of trade secrets and breaches of the PIIA "in connection with this motion."  Tr. at 11:17–24, 17:1–9.  As explained above, Sage failed to show a likelihood of success on the merits of any of those claims.  The Court notes that, at the hearing, counsel for Sage represented that he was also relying on a claim for breach of the "confidentiality provisions of the [PIIA]."  Tr. at 11:24; *see id.* at 17:6.  However, the Complaint does not list such a claim among the causes of action it asserts.  *See* Cmpl. ¶¶ 101–165.

Because the Court concludes that Sage failed to show a clear likelihood of success on the merits of any of its claims, Sage is not entitled to preliminary injunctive relief.  *See N. American Soccer League, LLC*, 883 F.3d at 37.  As such, the Court need not address the balance of hardships or the public interest.

## IV.    CONCLUSION

Accordingly, for the reasons set forth above, the application by Sage for a temporary restraining order and preliminary injunction is DENIED.

**SO ORDERED.**

**Date:  September 2, 2025**
       **New York, NY**

                                           **MARY KAY VYSKOCIL**
                                        **United States District Judge**